IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2022 AUG 22 PM 4: 05

JEFFREY P. COLWELL
CLERK

BY_____ DEP. CLK

Civil Action No. _____

(To be supplied by the court)

Jeffrey Inen _____, Plaintiff

v.

University of Colorado _____,

University of Colorado Denver Bioengineering _____,

University of Colorado Anschutz Medical Campus _____,

Anschutz Medical Campus Counsel _____, Defendant(s).

**Jury Trial requested:**
**(please check one)**
✓ Yes ___ No

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

## EMPLOYMENT DISCRIMINATION COMPLAINT

---

| NOTICE |
| --- |
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. |

**A.    PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

Jeffrey Inen     2200 N Ursula St. Apt. 241 Aurora, CO 80045
  (Name and complete mailing address)

(443) 414-9737     jinen1@umbc.edu
  (Telephone number and e-mail address)

**B.    DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:    University of Colorado Denver 1800 Grant Street Suite 400 Denver, CO 80203-1187
                      (Name and complete mailing address)

                      (303) 315-2700  human.resources@ucdenver.edu
                      (Telephone number and e-mail address if known)

Defendant 2:    University of Colorado Denver, Bioengineering 12705 E. Montview Ave., Suite 100
                      (Name and complete mailing address)

                      Aurora, CO 80045-7109  (303) 724-6280   bioengineering@ucdenver.edu
                      (Telephone number and e-mail address if known)

**C.    JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check all that apply)*

✓    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. (employment discrimination on the basis of race, color, religion, sex, or national origin)

✓    Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, et seq. (employment discrimination on the basis of a disability)

____    Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621, et seq. (employment discrimination on the basis of age)

____    Other: (*please specify*) _____

2

### D. STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action and the specific facts that support each claim. If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE: <u>Disability Discrimination</u>

The conduct complained of in this claim involves the following: (*check all that apply*)

| | |
|---|---|
| ____ failure to hire | ____ different terms and conditions of employment |
| ____ failure to promote | ✓ failure to accommodate disability |
| ____ termination of employment | ✓ retaliation |

✓ other: (*please specify*) <u>Discriminatory Conduct</u>

Defendant's conduct was discriminatory because it was based on the following: (*check all that apply*)

| | | | |
|---|---|---|---|
| ____ race | ____ religion | ____ national origin | ____ age |
| ____ color | ____ sex | ✓ disability | |

Supporting facts: See Attached Statement of Facts

3

**E.    ADMINISTRATIVE PROCEDURES**

Did you file a charge of discrimination against defendant(s) with the Equal Employment Opportunity Commission or any other federal or state agency? (*check one*)

 ✔ Yes  (*You must attach a copy of the administrative charge to this complaint*)

 ___ No

Have you received a notice of right to sue? (*check one*)

 ✔ Yes  (*You must attach a copy of the notice of right to sue to this complaint*)

 ___ No

**F.    REQUEST FOR RELIEF**
*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "F. REQUEST FOR RELIEF."*

Damages to be determined at trial.                Punitive damages to be determined at trial.

Nominal damages to be determined at trial

**G.    PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

*Jeffrey Anen*
(Plaintiff's signature)

21 August 2022
(Date)

(Revised February 2022)

4

B. DEFENDANT(S) INFORMATION

Defendant 3:   University of Colorado Anschutz Medical Campus
13001 East 17th Place, Aurora, CO 80045
(303) 315-2700  human.resources@cuanschutz.edu

Defendant 4:   Anschutz Medical Campus Counsel
Building 500, Room W5150, 13001 E. 17th Place, Aurora, CO 80045
(303) 724-8954. Tanya.cohen@cu.edu  erica.weston@cu.edu

## Table of Contents

Page 2-5: **I. Facts**
Page 5-8: **II. Legal Analysis; A. Disability Discrimination; 1. Disabled as defined by the ADA**
Page 8-12: **II. Legal Analysis; A. Disability Discrimination; 2. Adverse Employment Actions**
Page 12: **II. Legal Analysis; B. Retaliation; 1. I Engaged in a Protected Activity**
Page 13: **II. Legal Analysis; B Retaliation; 2. I Suffered Multiple Adverse Employment Actions**
Page 13: **III. Conclusion**
Page 14: **Exhibits and Evidence**

**Exhibit A: NRVM Prep Date**
**Exhibit B: Text to Dr. Brisa Pena while staying late in lab**
**Exhibit C: Email to Dr. Brisa Pena disclosing my lab notebook and contents**
**Exhibit D: Text to Dr. Pena showing lab notebook entry**
**Exhibit E: Online Lab Notebook Entry**
**Exhibit F: Email to Kendra, Ashley and Lauren when I went to Dr. Park's Lab**
**Exhibit G: Finished Decellularization Protocol on time**
**Exhibit H: Proof of attending lab week of November 8th**
**Exhibit I: Online Lab Notebook Data Entries**
**Exhibit J: Up to date online lab notebook entries**
**Exhibit K: Powerpoint Presentation Date**
**Exhibit L: Email to Dr. Pena about first presentation**
**Exhibit M: Follow up email from Dr. Pena after first presentation**
**Exhibit N: August Lab Presentation**
**Exhibit O: Email to Dr. Pena on lab progress**
**Exhibit P: November Lab Presentation**
**Exhibit Q: Computer Purchase Order**
**Exhibit R: Email to Dr. Pena concerning no power outlet**
**Exhibit S: Me Arranging to meet with Dr. Pena**
**Exhibit T: Me Requesting a reasonable accommodation from Dr. Pena**
**Exhibit U: Third Notification about power outlet with class schedule**
**Exhibit V: OSHA Regulation**
**Exhibit W: Bioengineering Application Essays**
**Exhibit X: NHLBI Research Supplement**
**Exhibit Y: Student Handbook**
**Exhibit Z: NIH Diversity Supplement**
**Exhibit AA: Email to Dr. Jacot concerning funding**
**Exhibit AB: Letter to Natalie Kersten informing her of my disability**
**Exhibit AC: Me contacting Dr. Pena about my disability**
**Exhibit AD: Email to Student Health Insurance Department**
**Exhibit AE: Email to Office of Diversity, Equity and Inclusion**
**Exhibit AF: Zoom Meet with Office of Diversity, Equity and Inclusion**
**Exhibit AG: Thank you email to Dr. Pena after she dismissed me from lab**
**Exhibit AH: CU Shares Agreement**
**Exhibit AI: Letter from Alice Wittmer in CU Shares Department**
**Exhibit AJ: Zoom Meeting with Janice Cannon**
**Exhibit AK: NIH Grant Department Holds**
**Exhibit AL: First Disability Email to Dr. Pena Stating Disability**

EEOC Charge No. 541-2022-00561
March 6th, 2022

Exhibit AM: Second Disability Email to Dr. Pena Stating Disability
Exhibit AN: Third Disability Email to Dr. Pena Stating Disability
Exhibit AO: Fourth Disability Email to Dr. Pena Stating Disability
Exhibit AP: Email from Dr. Pena Stating She has no funding for me
Exhibit AQ: Second Email from Dr. Pena Stating She has no funding for me
Exhibit AR: Email from Dr. Pena Stating I am on T32 grant with Dr. Shandas
Exhibit AS: T32 Question concerning continued funding and losing funding
Exhibit AT: Dr. Shandas Refusing to keep me on T32 proving loss of funding
Exhibit AU: T32 FAQ
Exhibit AV: Dr. Pena Request for Disability email that states I have a disability
Exhibit AW: Dr. Pena Acknowledging she read email stating I have a disability
Exhibit AX: Email from me contacting Anschutz Disability Services
Exhibit AY: CU Shares Agreement
Exhibit AZ: CU Anschutz Shares Eligibility
Exhibit BA: Janice Telling me to apply to Medicaid
Exhibit BB: Janice Telling me to apply for Financial Aid
Exhibit BC: Medicaid Denial
Exhibit BD: Janice and I's conversation about Financial Aid
Exhibit BE: Medicaid Discussion between the department and Dr. Pena
Exhibit BF: Colorado PEAK document
Exhibit BG: Medicaid Denial
Exhibit BH: Me requesting to postpone test due to chemotherapy crisis
Exhibit BI: Told to apply to supplemental programs for chemotherapy funding
Exhibit BJ: Dr. Pena accusing me of lying
Exhibit BK: Sandy Grandchamp Proving I Didn't Lie
Exhibit BL: Email to Dr. Pena Informing her I don't have power with no reply
Exhibit BM: Dr. Pena Telling Me I Have No Desk to Work at.
Exhibit BN: Proof that Daisy Chaining Power Outlets is a Fire Hazard
Exhibit BO: Civil Rights Title VII
Exhibit BP: Class Schedule Showing Double Full-Time Courseload
Exhibit BW: Cornell Acceptance Letter
Exhibit BX: Experiment Update to Dr. Pena
Exhibit BY: Thank you email to Natalie
Exhibit BZ: Email to Dr. Jacot stating my name has been slandered and I'm blacklisted
Exhibit CA: PhD Status Conversation Zoom Meeting
Exhibit CB: PhD Mentor Discussion in-person with Dr. Jacot and Mrs. Kersten
Exhibit CC: Principal Investigators told about me; proof I've been slandered
Exhibit CD: Introduction to Dr. Moghari
Exhibit CE: Dr. Payne Lab Discussion
Exhibit CF: Email to Dr. Pena about sick person in lab meeting
Exhibit CG: Email stating rising COVID cases
Exhibit CH: Email to Dr. Pena concerning my desk
Exhibit CI: Email to Lisa Meeks, Director of Office for Disability, Access and Inclusion
Exhibit CH: Email to contact new mentor since I didn't have one
Exhibit CI: Student Transcript

1

EEOC Charge No. 541-2022-00561
March 6th, 2022

Re:   The Regents of the University of Colorado,
      Jenny Willits
      Sr. Associate University Counsel
      Special Assistant Attorney General
      Office of University Counsel
      University of Colorado Denver Anschutz Medical Campus
      Denver, CO 80217-3364

## I.  **FACTS**

   i.

The defendant in this case alleges that I did not perform experiments on time but provided no evidence to support their accusation. It is common practice to leave your lab notebook in the lab and to never take it out. Hence, my lab notebook can still be found in Dr. Pena's laboratory. I highly encourage you to ask her to produce it for you. However, conveniently, I took pictures of my lab notebook, and I kept a copy of it online as well. If you would please see **Exhibit A**, on September 24th Dr. Pena asked me to do a neonatal rat ventricular myocyte (NRVM) prep to be performed on Monday, September 27th. **Exhibit B** shows my correspondence with her as I was finishing the experiment the same evening. I would like to note that this was well after the hours that she asked me to be in lab, proving that I was willing to go above and beyond to complete experiments for Dr. Pena. **Exhibit C** provides evidence that I told Dr. Pena about this lab notebook. **Exhibit D** shows the physical lab notebook entry from that evening as I was doing my calculations, of which is dated the next day. Furthermore, **Exhibit E** shows the online lab notebook that includes the last dates that I worked on the entry, which in this case is the day before I was dismissed from her lab on November 11th. Please see the 'Last modified' date on the left-hand of the page, something that cannot be manipulated. **Exhibit F** proves that both 'Decullularization' and 'Heart Tissue Digestion' are protocols that I was tasked with completing. **Exhibit F** also shows that I worked with Kendra Jones, Ashley Turcott and Lauren Li throughout the week of November 8th. Please contact them to verify that I was in Dr. Park's lab for the entirety of every day that week, excluding classes, completing the experiment. Kendra.Jones@cuanschutz.edu, Ashley.Turcott@cuanschutz.edu, Lauren.Li@cuanschutz.edu. **Exhibit G** shows my correspondence with them, proving that I completed the experiment in a timely manner. **Exhibit I** further shows that I diligently kept an up-to-date notebook of my experiments for Dr. Pena. **Exhibit J** shows the last date that I modified the page, which is the day before I was dismissed from Dr. Pena's lab. Of note, I was keeping the protocols in this online lab notebook to help make an online database that anyone from Dr. Pena's lab could access. This is something extra I did to help her lab. If it is necessary, I can provide more evidence to support my work in Dr. Pena's lab. It is also necessary to note that there are no rules and regulations on lab notebooks either for Dr. Pena's lab or for the university. I am providing the student handbook as proof (**Exhibit Y**). Furthermore, the first year of my training is meant to be didactic, as outlined directly in the Student Handbook (**Exhibit Y, Page 43, "Part 1: Research Plan"**). It states "Given that the candidate's first year consists of mostly didactic training, this plan is expected to be fairly general in its detail, and does not need to include preliminary research results or detailed research methods and approach." Therefore, the student handbook directly states that in my first year I'm meant to be concentrating mainly on learning in my classes and also that I'm not expected to have preliminary research results. Since I received all 'A's' in my first semester and continue to do well academically, Dr. Pena had no reason to dismiss me from the lab and the university has no argument and can produce no evidence as to why I was dismissed other than the fact that this

EEOC Charge No. 541-2022-00561
March 6th, 2022

was retaliation for engaging in a protected act under the ADA for asking for time to find a way to pay for my life-saving chemotherapy.

**ii.**

The defendants also alleged that I was untruthful about completing experiments. **Exhibits A-J** also serve to prove that I was truthful about completing the experiments throughout my time in the lab and I highly encourage you to contact Kendra, Ashley and Lauren (e-mails listed above) to prove the veracity of my statements. Further proof that I both completed experiments on time and kept Dr. Pena updated on my progress is in **Exhibit BX** where I updated her about the dECM protocol. Please note that they have provided no evidence to the contrary since this never occurred and is a lie.

**iii.**

The defendant then alleges that I was not prepared to present at lab meetings. The lab meeting I was tasked with presenting at was on August 24th. Please see **Exhibit K** which shows that I was prepared for the meeting since it shows that the 'modified date' as the morning of August 24th. Furthermore, **Exhibit L** shows my correspondence with Dr. Pena the day before the lab meeting, in which I shared my presentation with her and to which she responded, "It looks really good!!!" **Exhibit M** shows my correspondence with Dr. Pena after my presentation where she told me, "You did a very nice presentation." Please see **Exhibit N** which shows the presentation I presented to Dr. Pena, her lab and colleagues. She then tasked me with making a presentation for her on Friday, November 12th, which I completed and sent to her that morning, the email of which can be seen in **Exhibit O. Exhibit P** shows that data that I procured and was prepared to present to her that morning. **Exhibits K-P** prove that the defendant's claim of me not being prepared is false and baseless. Notably, the defendant has produced no evidence to support this claim.

**iv.**

Next, the defendant alleges that I ordered equipment without approval or authorization. I never had access to a purchasing card or any of Dr. Pena's accounts. Therefore, there is absolutely no way that I would have been able to order any equipment with or without approval. Please see **Exhibit Q** which shows that the only equipment that I had correspondence with anyone about was the computer that Dr. Pena ordered for me. It clearly shows Dr. Pena's name on the receipt at the beginning of the email. It even shows correspondence between Dr. Pena and Ms. Sandy Grandchamp buying the computer for me. It shows that the only thing I did was organize with Ms. Grandchamp on times when I could meet with her in lab, something that Dr. Pena told me to do. Please read **Exhibit R**, which shows that Sandy had informed me that the computer Dr. Pena ordered for me was broken and offering the option to replace it. The University of Colorado has failed to produce any evidence that I ordered anything with or without approval and that will continue to be the case since I never did. The emails in **Exhibits A-R** also show my professional and respectful communication when speaking with Dr. Pena, making the defendant's claim of me being "defensive" and of having "made excuses" to be completely baseless as well. Therefore, this point is also a lie.

**v.**

It is important to note that Dr. Pena never met with me to discuss her having any issues with my performance in lab. In fact, I was the one who coordinated a meeting with her since I was worried about our working relationship after she falsely accused me of lying. Please see **Exhibit S**, which shows that I wanted to speak to her about a situation where she falsely accused me of lying and where I asked to explain that I needed a reasonable accommodation since trying to figure out a way to pay for

3

EEOC Charge No. 541-2022-00561
March 6th, 2022

my chemotherapy, which I need to live, took so much time out of my schedule, necessitating me needing extra time to catch up on my classes. This occurred on November 10th at 12:30pm. Please see **Exhibit T** where Dr. Pena acknowledged my request for a reasonable accommodation and explicitly gave me extra time to work on the tasks she assigned me.

### vi.

On November 10th, Dr. Pena assigned me a presentation where she wanted me to do a literature review along with experimental planning that she wanted to be finished by Friday, November 12th. Dr. Pena knew my class schedule and therefore knew that it was the busiest day of my week (**Exhibit BP**). I sent my class schedule to her both when I signed up for classes and on November 1st (**Exhibit U**). Therefore, she knew that giving me a literature review along with experimental planning was impossible for me to complete in two days. This is proven by **Exhibit V** where she acknowledged that the work she tasked me with was too much for me to do given the time frame and my circumstances. Therefore, the above exhibits prove that she knowingly gave me an amount of work that would be impossible for any graduate student to complete in that time frame in order to remove me from the lab. This also proves that dismissing me from lab on November 12th was an act of retaliation while I was engaging in a protected act under the ADA.

### vii.

Dr. Pena has falsely accused me of lying in the past. I first arrived in lab on August 24th since Dr. Pena arranged for me to present at a lab meeting. It was on that day that she told me that she did not have a desk for me (**Exhibit BM**). I accepted the position in her lab in March 2021 and she had five months to arrange to get one for me but failed to do so. She finally got me my desk in September (**Exhibit CG**). When I was shown my desk, it was piled with lab coats and was being used as a place for storage for various boxes. After I cleaned it up, I tried to plug in my computer and found that there wasn't a power outlet there, at which time I notified her (**Exhibit BL**). I then spoke with her in person the next day about getting me a power outlet. The graduate student in her lab then proceeded to plug a power strip into the power strip at the desk beside mine (**Exhibit BJ**). This is an OSHA violation since it is a fire hazard (**Exhibit V, Exhibit BM**), so I unplugged it and removed it since there weren't any other power strips that would reach from my desk to the wall. I then informed Dr. Pena and Ms. Sandy Grandchamp about the outlet problem for a third time on October 29th (**Exhibit Q**). That day, I also told Ms. Grandchamp "The desk next to mine has outlets right next to it on the wall, but there's no way to access it from my desk. I tried. I just don't have any equipment." I contacted Ms. Grandchamp again on November 10th since I still didn't have a power outlet there (**Exhibit Q**). On November 10th, Brisa then sent me a text accusing me of lying about not having a power outlet (**Exhibit BJ**). I then emailed Ms. Grandchamp asking when she put the power strip there and she replied, "It was last week when I thought I was going to have your new PC ready to setup, so I apologize I did not pass that info on to you. Brisa did email me and I have explained the whole situation" (**Exhibit BK**). Dr. Pena and the University of Colorado is asserting that me not having a power outlet and not using the power strip that was plugged into another power strip as "making excuses". However, I was only following OSHA regulations and following federal law which was required training before starting in the lab (**Exhibit BQ**), so this should have never been a problem. This is also proof that she has falsely accused me of lying in the past, something that she is doing again in the university's position statement.

### viii.

Dr. Pena also accused me of lying about knowing how to do a technique called flow cytometry since I said that I learned it in the past in my post-baccalaureate at the University of Maryland School of

4

EEOC Charge No. 541-2022-00561
March 6th, 2022

Medicine, which is true. She claims that since I stated in an email that I want to learn how to do flow cytometry that I lied about doing it in the past. However, it is standard practice for institutions to require training new students on how to use their flow cytometry machines since the protocols, policies, procedures and the machines themselves differ between labs. This is no different here at the University of Colorado which requires those who have done flow cytometry in the past to be trained by Flow Cytometry Shared Resource (FCSR) staff. The FCSR site clearly states "All instrument training must be done by FCSR staff. If you have previous flow cytometry experience, this shouldn't take long. We need to ensure that you know the specifics of our equipment and our lab policies" (**Exhibit BS**). Hence, Dr. Pena falsely accused me of lying about this as well.

## II. Legal Analysis

### A. Disability Discrimination

**1. I established that I was disabled as defined by the ADA.**

**i.**

The fact that I am a person with a disability was established before I even came to the University of Colorado. This is evident from the fact that I put it in my personal statement that I submitted to the university upon application to the bioengineering program (**Exhibit W**). In fact, my disability was taken into consideration by the department when I was admitted to the department since they are under guidelines by the National Institutes of Health (NIH), where they get their funding, to diversify their program (**Exhibit Y**). This is a well-known fact throughout the university as shown on page 41 on their own Bioengineering Student Handbook (**Exhibit Y**) which lists grant NIH PA-12-149 Research Supplements to Promote Diversity in Health-Related Research (**Exhibit AK**). Within this grant it states "[…] that funds are available for administrative supplements to improve the diversity of the research workforce by supporting and recruiting students, postdoctorates, and eligible investigators from groups that have been shown to be underrepresented in health-related research." Furthermore, within this grant that the university has, (**Exhibit AK**) it states, "The NIH is particularly interested in encouraging the recruitment and retention of the following classes of candidates: […] B. Individuals with disabilities, who are defined as those with a physical or mental impairment that substantially limits one or more major life activities." More importantly, this is highlighted by the fact that before coming to the program, in March 2021, Dr. Pena and I worked together on applying for an NIH National Heart, Lung, and Blood Institute (NHLBI) Minority Supplement which can only be applied for by those who are disabled and/or part of an underrepresented group in the sciences. The entire bioengineering department, including Dr. Pena, was made aware of my disability upon applying for this grant since it is stated directly in part (1.1)(B) of the application (**Exhibit X**) which is quoted above. I am a part of both groups since I am disabled and a Pacific Islander which is stated directly in my NIH NHLBI application revision, where Dr. Pena's comments are explicitly noted in the right margin of the document, proving that she read through the entire document and was aware of my disability before I even started in the program (**Exhibit Z**). The fact that I am a person with a disability is stated in the very first sentence and at the conclusion of the minority supplement.

**ii.**

Further proof that Dr. Pena knew about my disability is proven by the fact that I mentioned it to her in my interview with her when I applied to the program. I encourage you to interview her concerning this point. She factored it into her decision to accept me to the university since she had me apply to the

EEOC Charge No. 541-2022-00561
March 6th, 2022

NIH NHLBI minority supplement (**Exhibit Z**). She discussed the minority supplement with the entire department, including my disability, because after I was accepted into the department, Dr. Pena realized that she didn't have funding for me, and Dr. Robin Shandas, Dr. Jeffrey Jacot (Department Director and Co-Director, respectively) and Ms. Natalie Kersten (Program Manager) all had to find a way to fund me (**Exhibit AP**). Dr. Shandas and Dr. Jacot knew about the NIH NHLBI diversity supplement for which Dr. Pena was applying since they all found out that it did not cover me as a PhD student (**Exhibit AQ**). Notably, this proves the disorganization of the department since they admitted me as a PhD student into their program, guaranteed me a position and funding, then told me that they did not have it (**Exhibit AA**). Please feel free to contact them to further verify these facts. robin.shandas@cuanschutz.edu, Jeffrey.jacot@cuanschutz.edu, natalie.kersten@cuanschutz.edu. Afterwards, since the department admitted me and did not have the funding, they had to include me in a T32 training grant, which they were later awarded (**Exhibit AR**). After Dr. Pena dismissed me from the lab I asked to stay on this grant since being on it would allow me to be on Medicaid and get free healthcare (**Exhibit AS**), a request that was later refused by Dr. Shandas (**Exhibit AT**). They included the fact that I had a disability in this training grant being that they are allowed to add a person with a disability according to the NIH NHLBI T32 grant number 5 under 'Frequently asked post-award questions' (**Exhibit AU**). I encourage you to request the grant application from the bioengineering department.

**iii.**

Further proving the fact that I told the entire department about my disability is when I contacted the department through Ms. Natalie Kersten about not being able to pay for my chemotherapy treatments due to the student health insurance having an out-of-pocket maximum that is impossible for any student to pay (**Exhibit AB**). After not hearing back from anyone in the university for three days, concerning my crisis, I then contacted Dr. Pena and described just how severe the situation was, being that I stated, "I can't afford the drug that's keeping me alive" (**Exhibit AC**). Dr. Pena then stated in **Exhibit AC** that she spoke to the Dean of the university about my disability, "Marjorie suggested me [sic] to contact our Dean […] which I will do". Dr. Pena and I met many times after that where she stated that she spoke to the Dean of the University of Colorado and the Dean of Anschutz Medical Campus. She stated that she spoke to the Dean of the University of Colorado about my disability and that he, and I quote, "doesn't give a shit".

**iv.**

Furthermore, I contacted the Department of Student Health Insurance here at the Anschutz Medical Campus to ask them how they could choose a plan that no graduate student would be able to afford (**Exhibit AD**). In this document I stated "I needed to tell you this because the health insurance plan isn't equitable. I'm sure it's fine for students who never have to use it, but for students like me with a disability, it feels like I wasn't even taken into consideration." I even stated the severity of my disease by stating "I'm facing the choice between financial ruin and staying alive." Dr. Pena then requested these emails from me (**Exhibit AV**), which I then forwarded to her (**Exhibit AL, Exhibit AM, Exhibit AN, Exhibit AO**). Proving that she read all of these emails, she replied "Your conversation was not that bad." (**Exhibit AW**). These emails explicitly state that I am a person with a disability.

**v.**

I went further by contacting the Office of Diversity, Equity and Inclusion multiple times through its director Dr. Regina Richards (**Exhibit AE**). In this email I stated, "I'm in a situation where

EEOC Charge No. 541-2022-00561
March 6th, 2022

I can't pay for the chemotherapy that's keeping me alive." I also stated, "The university has not treated this like the emergency that it is and I feel disposable here." I continued to ask for help from the department by reiterating, "I can't pay for the treatment that's keeping me alive. […] Also, please let me know if your office has any resources that can help me. I'd really appreciate it." More so, I even coordinated a Zoom call where I spoke with the entire department of Diversity, Equity and Inclusion which included Ms. Natalie Kersten and Dr. Pena (**Exhibit AE, Exhibit AF**). This call included Regina Richards, regina.richards@cuanschutz.edu, Ariel Redell, ariel.redell@cunschutz.edu, Jan Gascoigne, jan.gascoigne@cuanschutz.edu, Carl Johnson, carl.johnson@cuanschutz.edu, Natalie Kersten, natalie.kersten@cuanschutz.edu, and Dr. Brisa Pena, brisa.penacastellanos@cuanschutz.edu. During this meeting I told everyone in attendance that I had a disability, told them about my horrible experience trying to get help from the university for the treatment that I need to stay alive and asked what the department could do to help me with this situation. I'd encourage you to interview everyone that was in attendance at that meeting to corroborate my story.

**vi.**

In addition to the above, Ms. Natalie Kersten put me in contact with CU Anschutz Shares which is the University of Colorado Anschutz Medical Campus' Emergency Relief Fund. This fund is also known as the CARE team. Ms. Kersten contacted them on Wednesday October 13th, 2021 (**Exhibit AB**) and I still hadn't heard back from them on Friday October 15th, so I called them myself since I had no options of paying for my chemotherapy that I need to stay alive. I spoke with Alice Wittmer, a case management officer on the CARE team and told her that I have a disability and that I would die if I don't find a way to pay for my chemotherapy. She later acknowledged our conversation by sending me a letter on what resources were available to me (**Exhibit AI**). I then filled out the application which states that I have a disability and that I can't pay for my chemotherapy. Please contact her to obtain a copy of my intake application where I state I have a disability and to corroborate this at alice.wittmer@cuanschutz.edu. CU Anschutz Shares then put me in contact with Janice Cannon, who was my case manager throughout the process of me trying to find a way to pay for and continue to receive my chemotherapy. Janice and I had our first conversation on October 21st, 2021 (**Exhibit AJ**), where I told her that I was a student with a disability. During this conversation I told her which disabilities I had and that if I don't get my chemotherapy I'll die. She stated during this Zoom call that the university knows that I have a disability since they receive money for having students at their school who have disabilities, such as myself, since we are classified as minorities. She even put me in contact with Disability Services, proving that the university knew I had a disability (**Exhibit CI**). This is in line with the NIH grants on page 41 of the student handbook (**Exhibit Y**), which lists NIH PA-12-149 Research Supplements to Promote Diversity in Health-Related Research. She also informed me of the eligibility criteria for applying for aid and what I had to do in order to qualify, which is documented in **Exhibit AZ**. Therefore, in order to get emergency funding from CU Anschutz Shares, I had to contact Colorado PEAK to apply for Medicaid (**Exhibit BF**). However, since I had just come off of Medicaid since I was under the poverty line when I was living in Maryland, I knew I didn't qualify, and I conveyed this to Janice in our conversation. Please see the conversation in **Exhibit BA** on the 25th of October. They had me apply anyway. They also had me apply for financial aid (**Exhibit BB**). These processes took a substantial amount of time and were all things that I kept both my department and Dr. Pena up to date on (**Exhibit BE**). I found out that I was denied for Medicaid on October 22nd and I informed both Dr. Pena and Janice Cannon (**Exhibit BC, Exhibit BG**). I would like to reiterate that the process of having to constantly call, interview multiple times with Colorado PEAK for Medicaid and apply for financial aid were requirements for me to receive emergency relief to get the funds I needed to stay alive and as such, I had to take time out of

EEOC Charge No. 541-2022-00561
March 6th, 2022

my class schedule to do it which put me behind in my classes. Therefore, I had to ask for extra time to catch up on my coursework (**Exhibit BH**). A requirement of the program is to get a grade of B- or better in classes or else it is a failing grade (**Exhibit Y, Page 35**). This is required in order to continue in good standing in the program and continue to receive my funding and insurance which I need to pay for my chemotherapy and stay alive. Notably, I had to repeatedly ask for the emergency funds since they were not forthcoming about me applying for loans, and not scholarships and grants, through financial aid (**Exhibit BD**). This took even more time out of my schedule since I still didn't have any way of paying for my chemotherapy. This required me to contact the hospital's financial aid department, who had me apply to a list of supplemental programs that can help pay for my chemotherapy (**Exhibit BI**).

**vii.**

The first thing I did when I found out that I couldn't afford my chemotherapy was contact the bioengineering department manager, Natalie Kersten. During our conversation I explicitly stated "It just isn't ethical that a student with a disability isn't protected from financial ruin in a graduate school program" (**Exhibit AB**). She then told me that she spoke to leadership about me and my situation, since she was trying to help me figure out ways to pay for my life-saving treatment. Therefore, this further proves that I told the university about my disability and that the university is lying.

In summary, the University of Colorado knew about my disability before I was even admitted into the Bioengineering program, and they even admitted me based on that fact. This is highlighted by the fact that Dr. Pena and I worked on the minority supplement (Exhibit Z) before the program started, which explicitly states that I have a disability. Furthermore, this is exemplified by the fact that I sent Dr. Pena emails of my conversations with the Student Insurance Department where I stated I had a disability. This section establishes that everyone in the school with whom I was in contact knew that I had a disability, from my supervisor Dr. Pena to the Deans of the University of Colorado and the University of Colorado Anschutz Medical Campus.

## 2. I suffered multiple adverse employment actions.

**i.**

The University of Colorado has falsely claimed that I did not suffer any adverse employment actions and has done so by picking and choosing the legal arguments that best suit them; ignoring the fact that adverse employment actions take many forms. Title VII of the 1964 Civil Rights Act makes it unlawful for an employer to discriminate based on protected characteristics such as a disability (**Exhibit BO**). Title VII clearly states, "In addition, other actions that do not rise to the level of ultimate employment actions, such as a lateral transfer, an unfavorable reference that had no effect on a prospective employer's hiring decision, and the imposition of a more burdensome work schedule, may also be considered adverse employment actions in this context. These actions may dissuade a reasonable worker from making or supporting a charge of discrimination. *See White,* 548 U.S. at 68; *Ray v. Henderson,* 217 F.3d 1234, 1242-43 (9th Cir.2000)."

**ii.**

Dr. Pena imposed a more burdensome work schedule on me two days before she dismissed me from her lab. She helped me choose my classes and therefore knew that I was taking 9 credits: almost double that of a full-time graduate student (**Exhibit U, Exhibit Y page 33, Exhibit BP**). She even acknowledged that it was a lot of classes in the beginning of the semester and told me to drop one since

EEOC Charge No. 541-2022-00561
March 6th, 2022

I was at double the amount of credits. Therefore, she knew that giving me a presentation to put together in two days that included past results, a protocol and plan for stressing cells on beams, along with a full literature review and experimental planning for a separate project on sex differences and also finding potential genes to work with regarding fibrosis and biomechanics, was too much work to be completed in 2 days' time (**Exhibit BR**). Especially since I was also working in her collaborator's lab at the same time with Ashley Turcott, Kendra Jones and Lauren Li. I let her know that it was too much when I asked for my reasonable accommodation later that day and which she later acknowledged (**Exhibit T**). *See White,* 548 U.S. at 68; *Ray v. Henderson,* 217 F.3d 1234, 1242-43 (9th Cir.2000).

   iii.
   The University of Colorado has also asserted that I have not experienced a loss of pay due to Dr. Pena dismissing me from her lab, which is false. When I accepted the position into Dr. Pena's lab, I was put on a T32 training grant which gives the student untaxed income since the university accepted me and then told me they could not fund me (described above in section **1.ii.**). This brought my pay from $2,519.41 per month (**Exhibit BT**) to $2,833.33 per month (**Exhibit BU**). Dr. Pena told me that the agreement was that I would be on the T32 grant for 3 years since she did not have the funds to support me (**Exhibit AS**). The department then put me on this grant after mistakenly classifying me as having regular funding (**Exhibit BV**). When Dr. Pena made the unilateral decision to dismiss me from her lab, I lost that funding and in August of 2022 I will be losing hundreds of dollars every month and going back down to $2,519.41 (**Exhibit AT**). This has been money that I've been able to put towards my chemotherapy, medical co-pays, prescriptions, my insurance out-of-pocket maximum and the things that aren't covered by my insurance. Also, having untaxed income allows me to apply for Medicaid which will save me thousands of dollars throughout my graduate studies. Now that I've lost that funding, I will no longer be able to be approved for Medicaid. Effectively, Dr. Pena made a unilateral decision that will cost me thousands of dollars in both pay and in medical bills (**Exhibit BE, Exhibit AS**). This directly falls under the concept of a "materially adverse employment action" under Title VII of the 1964 Civil Rights Act where the Supreme Court settled the definition of an adverse employment action in the retaliation context. In *Burlington Northern and Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006). *See, e.g., Dalia v. Rodriguez,* 735 F.3d 1060, 1078 (9th Cir.2013) (en banc) (loss of pay); *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 970 (9th Cir.2002) (involving cut in monthly base salary).

   iv.
   I also suffered an adverse employment action in the context of losing the opportunity for investigative job experience. I joined Dr. Pena's lab because I was excited to be able to work alongside doctors in the Department of Cardiology at CU Anschutz. My excitement speaks for itself since I rejected going to an ivy league school (**Exhibit BW**) to come to her lab and dedicate the 5-8 years it takes to complete my PhD on her research. On November 12th, when she dismissed me without warning and without the committee review, which is required before a student is dismissed from a lab (**Exhibit Y page 47**), she did so without consulting the bioengineering department (**Exhibit AG**), completely disregarding school policy and my rights as a graduate student. In doing so, Dr. Pena made me lose the opportunity for which I relocated and uprooted my life which, in itself, is an adverse employment action. *See, e.g., Dalia v. Rodriguez,* 735 F.3d 1060, 1078 (9th Cir.2013) (en banc) (loss of pay and opportunities for investigative or other job experience).

   v.

9

EEOC Charge No. 541-2022-00561
March 6th, 2022

      On November 12th, 2021, when Dr. Pena dismissed me, she told me that she had spoken to all of her mentors, Natalie Kersten and the bioengineering department and that they had all agreed that I was not a good fit for her lab. I was shocked and stunned and begged to stay. She mentioned me begging to stay in **Exhibit AG** (November 15th, 12:36pm). I explained to her that she was judging my performance while under extreme distress since I was trying to find a way to pay for my chemotherapy. She even agreed later in an email that the stress of the situation affected my research performance (**Exhibit AG**). However, during the meeting she told me "Jeffrey, that's an excuse. Everyone has medical issues. The other PI in lab has chronic allergies." I further begged Dr. Pena to stay, telling her that I came 1,700 miles to Colorado from Maryland just for her lab and that now I have nowhere to go. She said, "Everyone always says that they have nowhere to go but there's always somewhere else." But in my case, she was breaking university policy since I was entitled to a committee review before she dismissed me from lab. The student handbook states "If a faculty member wishes to cease serving as advisor to a particular student, he or she must petition the GAC, who will decide to approve or deny the change. The advisor must include an explanation of the reasons for the change along with supporting documentation" (**Exhibit Y, page 47, #2 & 2.a**). The student handbook also states "For changes initiated due to poor student performance in the research environment, the advisor must provide documentation of meetings with the student and evidence of poor performance, covering at least three months of observation" (**Exhibit Y, page 47, 2.a**). This is something that Dr. Pena never did before she let me go from the lab. I started in Dr. Pena's lab in the middle of September and was dismissed on November 12th. Therefore, I was only in Dr. Pena's lab for less than two months, proving that she violated another university policy. I spoke with Dr. Pena for an hour at 12:30pm on November 12th and she was adamant that I was not a good fit for her lab. I said, "Thank you for the opportunity. I respect your decision" and left. The problem with her talking to her mentors in the lab is that they are not part of the bioengineering department, and she is. The first thing she had to do, according to the student handbook (**Exhibit Y**), was speak to the graduate affairs committee (GAC). Instead, she gossiped about me and slandered me throughout the department to the point where I was blacklisted and couldn't go back even if I wanted to (**Exhibit BZ**). I was completely dejected and felt like a failure, so I went back to the bioengineering department where I found Natalie Kersten in her office. She asked me to have a seat and I told her what just happened. Mrs. Kersten informed me that Dr. Pena did not have the power to make that decision on her own and asked if I was willing to resolve things with Dr. Pena. I agreed that I would like Dr. Pena to continue being my advisor. However, I told Natalie that now I feel as if I can't go back to Dr. Pena's lab because she just slandered me with all the PIs in the cardiology department (**Exhibit BY, Exhibit BZ**) who all also agreed that I'm not a good fit for her lab. Natalie told me that we'd work it out and said she had to send a few emails. Later, I sent an email thanking Dr. Pena for her time and the opportunity to be in her lab while also asking her "If there is any way that we can talk through this I am completely willing to do it. If you can take the time out of your busy day, I would be really grateful" (**Exhibit AG**). Mrs. Kersten then scheduled the meeting with Dr. Robin Shandas, Dr. Jeffrey Jacot and herself (**Exhibit CA**). The first thing Dr. Shandas told me when we met was "Dr. Pena doesn't want to be your mentor." At that point, I literally had nowhere to go, which, in a graduate program, is a horrible experience. I then asked Dr. Shandas "what about the committee review?" To which he responded, "I think it's best if we all move on." There was nothing I could say or do. He effectively denied my request for the committee review. They then scheduled a follow up meeting so that I could find a mentor since they just left me with no lab and no mentor (**Exhibit CB**). During that meeting I again expressed concern that I would have trouble finding a PI now since this happened with Dr. Pena. They assured me that this was "just a bad match". Please confirm this story with Dr. Shandas, Dr. Jacot and Mrs. Kersten (emails listed above in section **1.ii.**).

EEOC Charge No. 541-2022-00561
March 6th, 2022

During my search for a new mentor, I was given a few suggestions on who to contact. I contacted three different principal investigators (PIs) (**Exhibit CE**) and Dr. Jacot contacted two others for me (**Exhibit CD, Exhibit CH**). When I met with the PIs, they knew single about the situation with Dr. Pena. They sat me down and inquired. One of the PIs, after inviting me to tour his lab, contacted me a few days later to meet. When I arrived, I was told to sit down, I was put on the spot and was questioned "We know about the situation with your former PI. We would like to hear your side of the story" (**Exhibit BZ**). The entire experience with all the PIs was indescribably humiliating and embarrassing. Although I was assured this wouldn't happen, someone in the department was telling these PIs everything about the situation with Dr. Pena. Not only did Dr. Pena effectively blacklist me from ever going to the 8th floor of that research building ever again, but word was getting out about what happened, and it was jeopardizing any chances I had of getting into any other lab at the university (**Exhibit BZ**). I told Dr. Jacot that now I have to deal with nasty looks when I run into the people she spoke with and those in her lab. I even expressed my concern to Dr. Jacot about what was happening (**Exhibit CC**). This all happened because Dr. Pena did not follow university policies and the department refused to allow me to exercise my rights detailed in the student handbook (**Exhibit Y, page 47**). I would like to highlight that I did not have a lab or a mentor from November 12th, 2021 until November 29th, 2021, something that is completely unheard of in the bioengineering department. This was also during finals week which imposed immense stress on me during an already stressful time. I would also like to emphasize that I found my new mentor on my own and did not agree to leave Dr. Pena's lab for my new lab as the university's position statement states. Therefore, I have just presented evidence that the university has lied about this as well.

These events detail multiple adverse employment actions including lateral transfer and an unfavorable reference that had the potential to affect a prospective employer's hiring decision. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 500-01, 506 (9th Cir. 2000) (Involving low rating on job performance review); *Hashimoto v. Dalton,* 118 F.3d 671, 674 (9th Cir.1997) (involving negative job reference); *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987) (involving "undeserved performance ratings).

**vi.**

I also suffered an adverse employment action for voicing my concern about being right beside someone who was sick during a lab meeting in the middle of a pandemic being a person who is immunocompromised. The university had strict COVID policies during November 2021 since cases were rising (**Exhibit CG**). Those policies were to "stay home if you are feeling ill". I sent Dr. Pena an email stating that "I was sitting right next to [] who was coughing, sneezing and visibly sick. I was extremely uncomfortable" (**Exhibit CF**). Dr. Pena, as well as the two other doctors in the room were aware of my disability and my immunocompromised state. Even so, I stated it in the email saying "I would be concerned even if I wasn't immunocompromised. Please let me know if you have any concerns about this. I would rather come into lab meeting in person, but now that I see that people are allowed to come in sick I don't feel comfortable doing so." Every single lab meeting that we had has a Zoom option and everyone was free to either come via Zoom. Therefore, when I stated "I would rather come into lab meeting in person", I knew Dr. Pena was aware of there being a Zoom option since everyone uses it during every lab meeting and thus, I was going to use it instead of coming, as I stated, "in person". Please note that she never replied to my email even though I asked if she had any concerns with this (**Exhibit CF**). Dr. Pena could have easily replied stating that this particular person had chronic allergies, but she did not. The very next day I was dismissed from the lab. She stated during our meeting on November 12th that the person who was coughing and sneezing had chronic allergies, as if it was obvious. Again, Dr. Pena dismissed me without warning and without the committee review,

EEOC Charge No. 541-2022-00561
March 6th, 2022

in direct violation of the university's own policies (**Exhibit Y, page 47**) and in retaliation simply for being concerned about a person beside me having COVID which is known to be deadly. This was blatant retaliation for expressing concern about a possible COVID exposure since I have a disability. *See, e.g., Dalia v. Rodriguez,* 735 F.3d 1060, 1078 (9th Cir.2013) (en banc) (loss of pay and opportunities for investigative or other job experience).

**vii.**

The University of Colorado is asserting that "The only action that Mr. Inen experienced was a change in his mentor and the lab in which he was working. This action was agreed upon by Mr. Inen and did not affect his status as a student or his graduate student stipend". As can be seen in the section above (**Section 2.v.**), I never agreed to leave Dr. Pena's lab. It is very well documented that I did everything in my power to resolve the situation and make amends with Dr. Pena (**Exhibit AG**) and she still refused to be my mentor or allow me back into her lab, which can even be seen in the defense's **Exhibit 2** where she states it. Instead, she slandered me throughout the department and blacklisted me from ever going back. Dr. Shandas even refused to follow the department's policies of giving me the committee review that I was entitled to as a graduate student. I would like to point out that the defense's **Exhibit 2** is the only correspondence that Dr. Pena had with the department about dismissing me from the lab and it was after the actual event of her letting me go. Dr. Pena dismissed me from her lab on November 12th at 12:30pm. Please note that Dr. Pena sent **Exhibit 2** on November 12th at 5:54pm only after the department realized that her actions were discriminatory. This is highlighted by the fact that neither Mrs. Natalie Kersten nor anyone else in the department knew that she was letting me go until I came to Mrs. Kersten's office distraught and dejected because I had nowhere to go (**Exhibit AG, Exhibit BY**). Further exemplifying this point is the fact that in **Exhibit AG** Dr. Pena states "I also want to be fair and try again to mentor you" which is completely contradictory to the defense's **Exhibit 2** that was sent 3 days prior. Also, the action of Dr. Pena dismissing from her lab due to my disability has affected my stipend since I will now be receiving hundreds less per month.

## B. Retaliation

I have established a *prima facie* case of retaliation by having demonstrated that (1) I engaged in an activity protected by statute, (2) I was subjected to multiple adverse employment actions after and contemporaneously with the protected activity; and (3) that there is a causal connection between the protected activity and adverse action. *Miller v. Auto. Club O.M., Inc.,* 420 F.3d 1098, 1119 (10th Cir.2005); *Selenke v. Med. Imaging of Colorado,* 248 F.3d 1249, 1264 (10th Cir.2001).

### 1. I engaged in a protected activity.

The minute that I realized I couldn't afford my chemotherapy treatments I contacted everyone within the University of Colorado who I thought could help me. I proved above that I told everyone that I had a disability and that I needed time to find a way to pay for it. I also was very clear that if I do not get my chemotherapy, I will die. As a person with an autoimmune condition, that is the absolute truth. I was at the University of Colorado for a little more than 2 months, and in Dr. Pena's lab for under 2 months when I was let go from her lab. She violated every university and departmental policy they have when she did so. I have presented copious amounts of evidence that tie my disability to her actions of dismissing me from her lab. I have also presented evidence that each and every single one of Dr. Pena's claims are either baseless accusations or lies. Therefore, by engaging in a protected activity under the ADA I have successfully established a *prima facie* case of retaliation.

EEOC Charge No. 541-2022-00561
March 6th, 2022

**2.  I suffered multiple adverse employment actions.**

I have provided multitudes of evidence proving that I suffered multiple adverse employment actions which include losing pay, being coerced into a lateral transfer, having a more burdensome work schedule imposed and suffering from an unfavorable reference to all the prospective labs that I wanted to join, including being blacklisted from the entire floor where Dr. Pena works as a result of her gossip and failure to follow university policy. As I proved extensively above, I never agreed to leave Dr. Pena's lab and, in fact, I was coerced by the department to leave and find another lab; one which I found of my own volition.

**III. <u>Conclusion</u>**

I have proved extensively throughout this rebuttal that every one of the claims made by Dr. Brisa Peña-Castellanos and the University of Colorado is a lie which they are using in order to attempt to conceal this discriminatory practice against me. As such, the University of Colorado is guilty of making a material misrepresentation during the course of an EEOC investigation and, as such, is guilty of committing a punishable crime under 18 U.S.C. Section 1001. The requirement that the misrepresentation be "material" is met if the statement has the "natural tendency to influence or [is] capable of influencing, the decision of the decision-making body to which it is addressed." *U.S. v. Gaudin,* 515 U.S. 506, 510 (1995).
I was only attending the University of Colorado for a little more than two months when I was let go from Dr. Pena's lab. I was in good academic standing when this occurred and continue to be in good standing since I am a straight A student (**Exhibit CI**), showing that neither Dr. Pena nor the university had no reason to dismiss me and further proving that their actions were retaliatory in nature due to my disability. Due to the negligence of Dr. Pena and the University of Colorado, I have suffered nothing but consequences for something that was just a reasonable accommodation that I needed in order to stay alive. They dismissed me from a lab simply for trying to find a way to pay for life-saving chemotherapy and they should be ashamed of themselves. The university has known that their health insurance has been unaffordable for students for years and yet they still do no care enough to do anything about it. Also, the first year of a PhD student's training is meant to be didactic and they are not expected to include preliminary research results, as per the Student Handbook (**Exhibit Y, Page 43, Part 1: Research Plan**). Taking into account all of the proof I have brought forth; the Equal Employment Opportunity Commission should proceed with its investigation and immediately charge the University of Colorado with discrimination.

Sincerely,
Jeffrey Inen

August 22nd, 2022

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | ☐ FEPA ☒ EEOC | 541-2022-00561 |

| COLORADO CIVIL RIGHTS DIVISION | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| MR. JEFFREY A INEN | (443) 414-9737 | 1985 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2200 N URSULA ST., APT. 241, AURORA, CO 80045 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| UNIVERSITY OF COLORADO DENVER BIOENGINEERING | 201 - 500 | (303) 724-5893 |

| Street Address | City, State and ZIP Code |
|---|---|
| 12705 E MONTVIEW BLVD, STE 100, AURORA, CO 80045 | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest       Latest |
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | 10-14-2021    11-12-2021 |
| ☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION | |
| ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On or about August 15, 2021, I was hired to work as a graduate student in a Bioengineering lab at the University of Colorado Denver. I worked in this position until I was discharged from the lab on or about November 12, 2021, while I remain enrolled as a graduate student.

I am a person with a disability and my employer became aware of my disability on or about October 14, 2021, when I requested time off from the lab to deal with issues relating to my disability. My request for time off was granted. On or around November 10, 2021, I met with my lab supervisor who expressed concern that my lab work was not being completed. On or around November 12, 2021, I was discharged by my lab supervisor without warning and without the committee review, which usually occurs when a graduate student is discharged from a lab.

I believe that I was discriminated against because of a disability and subjected to retaliation for engaging in a protected activity by requesting a reasonable accommodation, in violation

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Jeffrey A Inen on 12-22-2021 02:06 PM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 541-2022-00561 |

| **COLORADO CIVIL RIGHTS DIVISION** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

**of the Americans with Disabilities Act of 1990, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Jeffrey A Inen on 12-22-2021 02:06 PM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Jeffrey A. Inen**
**2200 N. Ursula Street, Apt. 241**
**Aurora, CO 80045**

From: **Denver Field Office**
**950 17th Street**
**Suite 300**
**Denver, CO 80202**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **541-2022-00561** | **Philip Gross,** **Supervisory Investigator** | **(720) 779-3637** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

June 02, 2022

Enclosures(s)

(for)

**Amy Burkholder, Director**
**Denver Field Office**

(Date Issued)

cc:   **Doug Kayson**
      **Director of Employee Relations and Performance**
      **University of Colorado Denver, Anschutz Medical**
      **Campus**
      **P.O. Box 173364, Campus Box 130**
      **Denver, CO 80217**

      **Jenny Willits**
      **Sr. Associate University Counsel**
      **University of Colorado Denver, Anschutz Medical**
      **Campus**
      **13001 E. 17th Avenue**
      **Aurora, CO 80045**

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or
record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you
did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was
*issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office. If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do *not* relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**    The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

> ➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
> ➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**
> ➢ **Only one** major life activity need be substantially limited.
> ➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
> ➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**
> ➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**
> ➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
> ➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
> ➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
> ➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

***Note:    Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*** For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

JS 44 (Rev. 10/20)    District of Colorado

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jeffrey Inen

**(b)** County of Residence of First Listed Plaintiff    Adams
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

University of Colorado
University of Colorado Anschutz Medical Campus

County of Residence of First Listed Defendant    Denver
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Anschutz Medical Campus Counsel

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
Plaintiff
- ☒ 3  Federal Question
*(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
Defendant
- ☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

|                                        | PTF | DEF |                                                        | PTF | DEF |
|----------------------------------------|-----|-----|--------------------------------------------------------|-----|-----|
| Citizen of This State                  | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State               | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                         | ☒ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964 and Americans with Disabilities Act

☐ AP Docket

Brief description of cause:
Dismissed from lab without warning or committee review after asking for reasonable accommodation.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$300,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

## FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____



JS 44 Reverse (Rev. 10/20)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Colorado

| | |
|---|---|
| Jeffrey Inen | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | )    Civil Action No. |
| University of Colorado | ) |
| University of Colorado Bioengineering | ) |
| University of Colorado Anschutz Medical Campus | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Anschutz Medical Campus Counsel
Building 500 Room W5150
13001 E. 17th Place Aurora, CO 80045

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jeffrey Inen
2200 N Ursula St. Apt. 241
Aurora, CO 80045

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | | |
|---|---|---|
| Jeffrey Inen | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| University of Colorado | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  Anschutz Medical Campus Counsel

*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within __30__ days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:  ___08/22/2022___

*Jeffrey Inen*
*Signature of the attorney or unrepresented party*

Jeffrey Inen
*Printed name*

2200 N Ursula St. Apt. 241
Aurora, CO 80045

*Address*

jinen1@umbc.edu
*E-mail address*

(443) 414-9737
*Telephone number*